THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* ALBERT ELLIOTT, Defendant-Appellant.

First District (1st Division)   No. 77-388

Opinion filed February 5, 1979.—Rehearing denied March 14, 1979.

874

Edward Levett, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Francis X. Speh, Jr., and Armand L. Andry, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE CAMPBELL delivered the opinion of the court:

This is an appeal from a judgment of the circuit court of Cook County convicting the defendant, Albert Elliott, of murder, after a jury trial. Upon this conviction the defendant was sentenced to a term of not less than 14 years nor more than 14 years and one day in the State Penitentiary.

The issues presented for review are: (1) whether the defendant was denied his statutory right to a speedy trial while being held in custody; (2) whether the trial court abused its discretion in granting the People a 60-day extension beyond the term time; and (3) whether the defendant was proven guilty beyond a reasonable doubt.

On April 17, 1974, the defendant was charged with the March 3, 1974, murder of his wife, Iris Elliott, by indictment.

The defendant was arraigned on May 3, 1974, and on June 17, 1974, the defendant filed a motion for a behavioral clinic examination to determine his fitness to stand trial. After the examination by the Psychiatric Institute of Cook County, appointment of a second psychiatrist at county expense, and the second examination of the defendant, a hearing was held before a jury on the issue of the defendant's fitness. On December 27, 1974, the defendant was found not fit to stand trial and was committed to the Department of Mental Health (hereinafter called "the Department"). Immediately thereafter the People were granted: (1) a motion to strike the indictment with leave to reinstate; and (2) a motion for a warrant on said indictment, to the Department, directing the Department to return him to the criminal court.

The defendant underwent examination and treatment until he was discharged from the custody of the Department, after a hearing held on March 3, 1975.

A petition for release on bail of recognizance was filed by the Attorney General when the defendant was discharged. On March 24, 19⁻5, bond was set at $10,000 and upon motion of the People another behavioral clinic examination and fitness hearing was ordered. The defendant again petitioned the court for appointment of a second expert which petition was granted with the caveat that the fee was to be paid by the defendant.

On June 27, 1975, the defendant filed a motion in the circuit court to review the bail order. The court then granted the defendant leave to file a motion in the appellate court. On July 21, 1975, the Appellate Court, First District, ordered the defendant released on a personal recognizance. On July 23, 1975, the defendant was released.

On July 30, 1975, the defendant filed a motion to dismiss the cause. The defendant alleged that he was improperly transferred from the Department of Mental Health to the county jail until he was released on his personal recognizance by the appellate court. The defendant also alleged that the cause had not been properly reinstated after being stricken, and that he was denied a speedy trial. The motion to dismiss the indictment was denied on November 4, 1975.

A second fitness hearing before a jury was held on March 3, 1976. The defendant was found fit to stand trial and on motion of the People, the cause was reinstated.

From April 29, 1976, the cause was continued by the People. On October 5, 1976, the People sought an extension of the term in order to obtain the attendance of a witness, Daisy Dancy.

Cook County sheriff's investigator Dirk Lowry testified he was assigned to locate a witness, Daisy Dancy. He explained that Daisy Dancy was an eyewitness to the shooting. Among the agencies Investigator

Lowry contacted were the Illinois Bell Telephone Company, Commonwealth Edison, the Board of Election Commissioners, the Chicago Housing Authority, the Cook County Jail, the House of Corrections, the Chicago Police Department, the Bureau of Vital Statistics and the Department of Immigration. The dockets of some of the divorce courts were also examined, and Investigator Lowry visited the witness' last known address at 427 West 65th Street, Chicago, Illinois. Although the witness could not be located, Investigator Lowry spoke to someone at the address who advised him that the witness no longer lived at that address and no longer received mail there. Inquiry with the Post Office revealed there was no forwarding address left by the witness. Former neighbors of the witness at 6440 South Normal indicated she still frequented the neighborhood. The investigator left his name and telephone number in the event that the witness reappeared.

After all testimony the trial court found that the People had exercised due diligence in attempting to locate Daisy Dancy and that there appeared to be a possibility that the witness could be located at a later date. The petition for extension of the term was, therefore, allowed.

At the trial the first witness called by the People, Officer Miller, testified that he responded to a call on March 3, 1974, at 2:50 p.m. concerning the shooting of a woman at 6442 South Normal, Chicago, Illinois. When he arrived at the scene three people were on the porch, Obie Gamble, Betty Butler, and Lynn Wright. Officers Rokas and Dahlberg arrived as Officer Miller was talking to Betty Butler. The officers entered the Elliott apartment. Upon entering, the officers saw the defendant sitting on the bed. The defendant was asked his name, placed under arrest and advised of his rights. Mr. Gamble asked the defendant where his (Gamble's) gun was and the defendant responded that he had thrown the gun in the garbage. Some of the officers and Mr. Gamble searched and found the gun and the holster. The pistol contained five live rounds and one spent shell.

Lynn Wright lived on the same floor of the building as the defendant. She testified that she was on the porch of the building on March 3, 1974, at 2 p.m. along with Betty Butler, Leo Miller and Obie Gamble. While they were on the porch, Mr. Miller said that he heard a shot. Lynn Wright then saw Mrs. Elliott come out of the building, say that the defendant had shot her and ask someone to call the police. Mrs. Elliott then fell down the stairs. Mr. Miller picked her up from the ground and took her to the hospital. Lynn Wright had seen the defendant with a gun in his hand earlier in the day.

Betty Butler testified that she also saw Mrs. Elliott come out of the building and heard her say that her husband, the defendant, had shot her.

Mr. Obie Gamble testified that on the morning of March 3, 1974, he

was in his apartment at 6440 South Normal. Mr. Gamble went to the defendant's apartment and asked the defendant to keep his revolver until he returned from church. The defendant agreed and was given the loaded gun. Mr. Gamble saw the defendant place the weapon under the pillow on the bed where he was seated. Mr. Gamble then went to church, and later returned from church at about 2 p.m. After putting his coat in his apartment he joined Betty Butler, Lynn Wright and Leo Miller on the porch. He then heard a gunshot and saw Mrs. Elliott come out of the building screaming for help and saying that her husband had shot her. When Mr. Gamble asked the defendant about his gun the defendant said he threw the gun away. When Mr. Gamble asked the defendant had he shot his wife with Gamble's gun, the defendant replied that he had used his own gun, that "she ought to mind me and that he would shoot anybody." Mr. Gamble then went back to the porch to await the police. Mr. Gamble corroborated the testimony of Officer Miller concerning the search for the weapon and its discovery.

The defendant, Albert Elliott, testified that on March 3, 1974, Obie Gamble brought a gun to him in his apartment and asked him to keep the weapon while Gamble went to church. The defendant testified that he carried the gun toward his drawer to put it up after the gun was brought to him. As he got up, his wife came into the apartment and he started towards her with the pistol in his hand when it went off. The defendant said Mr. Gamble then came into the apartment, grabbed his gun and went out the back door. On cross-examination the defendant stated that the gun was brought to him in the holster. The defendant admitted that when he shot his wife he simply picked the gun up and it went off. He asserted that the gun remained in the holster at all times. In the closing argument the Assistant State's Attorney explained that the jury could clearly see that there was no bullet hole in the bottom of the holster as would have to be the case if the defendant's testimony was believed.

After the defendant's testimony, the defense rested. Closing arguments were then heard. The jury was instructed and after deliberation found the defendant guilty of the murder of Iris Elliott. Argument was heard in aggravation and mitigation and the defendant was sentenced to the penitentiary for a term of not less than 14 years nor more than 14 years and one day. From the judgment of conviction the defendant now brings this appeal.

The defendant claims he was improperly held in custody from March 3, 1975, until July 23, 1975, on an indictment that had been stricken with leave to reinstate, and was thereby denied his right to a speedy trial, as guaranteed by section 103—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1975, ch. 38, par. 103—5). Section 103—5 provides, in pertinent part, as follows:

"Every person in custody in this State for an alleged offense shall be tried by the court having jurisdiction within 120 days from the date he was taken into custody unless delay is occasioned by the defendant, by an examination for competency ordered pursuant to Section 104—2 of this Act, by a competency hearing, by an adjudication of incompetency for trial, by a continuance allowed pursuant to Section 114—4 of this Act after a court's determination of the defendant's physical incapacity for trial, or by an interlocutory appeal."

The People point out that during the period of incarceration complained of, the defendant moved for a continuance on May 2, 1975, and stipulated to a "by-agreement" continuance on April 18, 1975; in addition, a fitness hearing was ordered by the court on March 24, 1975, and was not concluded until March 3, 1976. The People conclude that these events toll the running of the speedy trial statute. The defendant concedes that generally these events toll the running of the speedy trial statute. However, he suggests that certain special factors existed which do not permit the above stated events to toll the running of the statute.

The defendant claims that since he was held in custody while the indictment charging him was stricken, the circuit court was without jurisdiction, defendant's counsel could not, by any act of agreement or on his own motion, confer jurisdiction upon the court and the circuit court could not properly hold the defendant in custody during the period that a fitness hearing was pending. However, State statute provides that once a defendant is found unfit, and sent to the Department of Mental Health, and is then treated and found to be no longer in need of mental treatment, the Department "* * * shall petition the trial court to release the defendant on bail or recognizance, under such conditions as the court finds appropriate, which may include, but need not be limited to requiring the defendant to submit to or to secure treatment for his mental condition." (Ill. Rev. Stat. 1975, ch. 38, sec. 1005—2—2(a).) At the time of the defendant's release from the Department, a motion to reinstate the indictment would have had no impact on the proceedings because even if the motion to reinstate had been made, the defendant could not have been tried since he had been previously found unfit to stand trial. A finding of fitness would necessarily precede scheduling a trial.

■■ By the aforementioned statute the trial court had jurisdiction over the defendant to order a fitness examination and schedule a fitness hearing (Ill. Rev. Stat. 1975, ch. 38, par. 1005—2—2(a)) and these procedures, among other things, tolled the running of the speedy trial statute (Ill. Rev. Stat. 1975, ch. 38, par. 103—5).

The defendant further claims the People were not diligent in their search for Daisy Dancy, the People's witness, there was no showing there

were reasonable grounds to believe that Daisy Dancy would be found at a later date and, therefore, the trial court abused its discretion in granting the People a 60-day extension according to subsection (c) of the speedy trial statute. This subsection provides:

"If the court determines that the State has exercised without success due diligence to obtain evidence material to the case and that there are reasonable grounds to believe that such evidence may be obtained at a later day the court may continue the cause on application of the State for not more than an additional 60 days." Ill. Rev. Stat. 1975, ch. 38, par. 103—5(c).

The Illinois courts of review consistently hold that a decision to grant an extension of time rests in the sound discretion of the trial judge and its actions in granting or denying the extension should not be disturbed upon review unless there is a clear abuse of discretion. *People v. Poland* (1961), 22 Ill. 2d 175, 174 N.E.2d 804; *People v. Morris* (1971), 1 Ill. App. 3d 566, 274 N.E.2d 898.

The testimony of Cook County sheriff's investigator Lowry outlines a history of the investigation of the whereabouts of Daisy Dancy, the sought after People's witness. He indicated that between March 4, 1974, and July 15, 1976, an investigation was conducted by Investigators Crawl and Rockowitz and a report was submitted on June 5, 1974. Also, a report had been submitted by a previously assigned investigator, Maiorane, on July 15, 1976. In addition, Investigator Lowry had spoken to Obie Gamble concerning the case on a number of occasions and efforts to locate the witness were undertaken periodically well prior to the scheduled trial.

Among the agencies contacted by Investigator Lowry were the following: The Post Office, Illinois Bell Telephone Company, Commonwealth Edison, the Board of Election Commissioners, The Chicago Housing Authority, the Cook County Jail, The Cook County House of Corrections, The Chicago Police Department and The Bureau of Vital Statistics.

Investigator Lowry also testified that he visited two addresses where the witness had lived, 427 West 65th Street and 6440 South Normal. At both addresses he talked to neighbors to ascertain the whereabouts of Daisy Dancy. He was led to believe that the witness was frequenting the area of 64th and Normal. Neighbors had indicated that the witness was seen in the area. He believed he could locate the witness because of statements of those various people in the neighborhood.

The testimony of Investigator Lowry reveals that the People did exercise due diligence and that there were reasonable grounds to believe the witness may have been found. Therefore, the trial court did not abuse its discretion in allowing the People's motion for an extension of the term.

The defendant additionally argues he was not proven guilty of murder beyond a reasonable doubt because of his senile mental condition at the time of the occurrence and at the time of the trial. The defendant was 73 years old at the time of the trial.

At the trial the evidence showed that Mrs. Iris Elliott ran from her apartment to her porch, stated that her husband had shot her, asked for help and then collapsed down the stairs to the ground. The defendant admitted on the witness stand that he shot his wife. The defendant's defense was that the gun went off accidentally while still buckled in the holster. Yet, the defendant later admitted that the gun could not have been fired while in the buckled holster, since there was no bullet hole in the bottom of the holster. In addition, evidence was adduced that immediately after the shooting, and after the defendant admitted shooting his wife, the defendant stated that "she ought to mind me" and that he would shoot anybody.

■ Even though the ultimate burden is on the People to prove that the defendant's act was criminal, once the defendant admits having fired the fatal shot, he must show circumstances justifying, mitigating or excusing his act, unless the circumstances were sufficiently manifest from the proof of the prosecution. *People v. Wilkes* (1971), 2 Ill. App. 3d 626, 276 N.E.2d 761; *People v. McCreary* (1963), 29 Ill. 2d 295, 194 N.E.2d 233.

The confusion of the defendant on the stand simply fails to prove justification or excuse for the defendant's act of shooting his wife, and fails to raise a reasonable doubt as to his guilt.

■ The record before us makes it clear that the defendant was proven guilty beyond a reasonable doubt of the offense of murder.

In addition to the issues commented upon above, the briefs on appeal raise an issue which is not properly before this court. The defendant's brief claimed the trial court erred in directing him to pay for a psychiatric examination, which was requested by the defendant. Later, however, the defendant's counsel informed this court that said psychiatric examination was never performed, and therefore the issue was withdrawn. Since this issue is not properly before us it will not be considered for review.

For the foregoing reasons the judgment of the circuit court of Cook County is hereby affirmed.

Affirmed.

GOLDBERG, P. J., and O'CONNOR, J., concur.